FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 02 2014

JAMES W. McCORMACK, CLERK
By: _____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BUFFALO RIVER WATERSHED ALLIANCE;
ARKANSAS CANOE CLUB; NATIONAL PARKS
CONSERVATION ASSOCIATION; and
OZARK SOCIETY                                                    PLAINTIFFS

v.                              No. 4:13-cv-450-DPM

DEPARTMENT OF AGRICULTURE, Tom
Vilsack, in his official capacity as Secretary,
United States Department of Agriculture;
SMALL BUSINESS ADMINISTRATION,
Jean Hulit, in her official capacity as Administrator,
Small Business Administration, and Linda Nelson,
in her official capacity as Arkansas District Director,
Small Business Administration; and FARM SERVICE
AGENCY, Juan Garcia, in his official capacity as
Administrator, Farm Service Agency, and Linda
Newkirk, in her official capacity as Arkansas
State Executive Director, Farm Service Agency        DEFENDANTS

ORDER

Plaintiffs, a group of environmental groups, claim that the Farm Service

Agency and the Small Business Administration violated several

environmental laws by guaranteeing loans to C&H Hog Farms without

adequately assessing the farm's environmental impact. The Arkansas

Department of Environmental Quality approved having approximately 6,500

swine at the farm. № 45 at 6. The Farm Service Agency says it assessed the

environmental issues and its administrative record supports its finding that C&H wouldn't significantly affect the environment. The Small Business Administration didn't assess the farm's environmental effects and says the law didn't require it to. There are important threshold issues about standing—particularly causation and redressability. Plaintiffs bring claims under the National Environmental Policy Act, the Endangered Species Act, and the Buffalo National River Enabling Act. Plaintiffs also claim that the Farm Service Agency violated its own regulation. The parties agree on the material facts—subject, of course, to some scuffling at the margin—and have supplemented their Local Rule 56.1 statements with brief stipulations. № 33-1, 39, 40 & 43.

**1. Facts.** C&H Hog Farms, Inc., is in the vicinity of Mount Judea, Arkansas, near the Buffalo National River along Big Creek. Nine of the farm's waste-application fields are on the Creek, one of the River's tributaries. Big Creek flows into the River six stream miles from the farm. C&H is the first large concentrated animal-feeding operation in the Buffalo River watershed to receive an operating permit from the Arkansas Department of Environmental Quality. The next largest farm has roughly 400 swine. To

receive its permit, C&H had to propose a plan for managing the pigs' waste. This plan included spreading the waste on various fields in the area, including the nine that abut Big Creek.

In early 2012, C&H applied for approximately $3.6 million in loans from Farm Credit Services of Western Arkansas. Farm Credit required further assurances before making the loans, so it and C&H applied for loan guaranties from two federal agencies.

First, the Small Business Administration guaranteed seventy-five percent of a roughly $2.3 million loan from Farm Credit. The Small Business Administration acted without evaluating what effect the farm might have on the environment.

Second, the Farm Service Agency considered backing a second loan. Before it could issue a guaranty for an operation of C&H's size, the Farm Service Agency's regulations required it to prepare an Environmental Assessment. The agency was duty bound to explore how this farm might affect the environment, identify natural resources in the area, analyze alternatives, and propose measures to mitigate any environmental consequences that might flow from the farm. While preparing its

Environmental Assessment, the Farm Service Agency reviewed several documents that C&H provided, including the waste-disposal plan submitted to the Arkansas Department of Environmental Quality. The Farm Service Agency also wrote the United States Fish and Wildlife Service, asking about C&H's potential effect on any endangered species in the area. Fish and Wildlife responded that the endangered Gray Bat lived in caves and foraged around C&H. Fish and Wildlife also suggested some potential mitigation steps and highlighted areas for further investigation. Its response, Fish and Wildlife cautioned, was informational, not a blessing.

The Farm Service Agency eventually finished its Environmental Assessment. This evaluation didn't mention the Buffalo River or Big Creek, misstated that C&H would have 2,500 swine, didn't address any alternative locations, didn't mention the Gray Bat, and concluded without explanation that mitigation measures were unnecessary. The Agency then used its assessment to issue a draft Finding of No Significant Impact. It published notice of its conclusion in the *Arkansas Democrat-Gazette* for three days in August 2012 and welcomed public comment for fifteen days. Nobody commented. In late August 2012, the Agency adopted the Finding of No

Significant Impact, which cleared the way for its guaranty. The Farm Service Agency guaranteed ninety percent of another $1.3 million loan from Farm Credit to C&H.

The farm began operating in late 2013. C&H currently has approximately 6,500 swine. Give or take a few, there are 4,000 piglets, 2,500 sows, and 3 boars. № 20 at 3. These swine will generate approximately 1,780,000 gallons of waste-filled water each year. *Ibid*. The water is stored in two small settling ponds near the barns. The ponds seep. It's uncertain how much waste water will seep out, but C&H's engineers estimated that several thousand gallons a day could. № 41 at 4; *SBA Record at P-661 & P-680*. Each year in the spring and the fall, C&H plans to drain the ponds. After testing nutrient levels in certain nearby fields, C&H will spray the water on them. The nutrient levels in the fields will determine how much waste water is sprayed: the goal is not to exceed acceptable targets for phosphorus, nitrogen, and other nutrients, which the fields need but could be harmful in excess. № 45 at 9. The Buffalo River watershed is characterized by karst geology — underground limestone, which has been eroded over time. № 30 at 3, 30-8 at 5–6 & 40 at 3. Whether there's karst under C&H's farm is unknown.

**2. Standing.** Plaintiffs are the Buffalo River Watershed Alliance, the Arkansas Canoe Club, the National Parks Conservation Association, and the Ozark Society. The parties agree on the first standing issue — injury in fact. Each group has members who use, enjoy, and care about the Buffalo River; and C&H's farm either has affected, or likely will affect, each group's interests. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992). C&H, though, isn't a party. The Farm Service Agency and Small Business Administration say their guaranties didn't cause Plaintiffs' injuries; and, if they did, this Court can't redress those injuries in the absence of C&H or Farm Credit Services of Western Arkansas.

- *Causation*

The legal premise of each guaranty was that C&H couldn't otherwise obtain financing on reasonable terms. 15 U.S.C. § 636 & 7 U.S.C. § 1983. C&H had to, and did, borrow $3.6 million to start this farm. These statutes, coupled with the necessity of the large loans, make it substantially unlikely that C&H would have come into being absent the guaranties. Without the guaranties, there would've been no loans. Without the loans, no farm.

The federal Agencies argue that independent third parties break the

-6-

causal chain between the guaranties and Plaintiffs' injuries. Farm Credit, the argument runs, could have forgone the guaranties, and C&H could have borrowed the money on unreasonable terms. That's possible, of course. This argument is a version of the horseshoe-nail theory of causation: too many acts, and too many independent actors, are between the guaranties and C&H's construction to conclude that the guaranties caused any harm. *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011) (Posner, J.).

The federal Agencies' argument runs into the record and the statutory premise of each guaranty: Farm Credit Services of Western Arkansas said it wouldn't lend the several million dollars needed by C&H without government backing; and the Agencies could not back the loans without concluding that reasonable financing was otherwise unavailable. The theoretical possibility that the deal could have been done on other terms doesn't undermine causation. The foundational undisputed fact is that Farm Credit, the federal Agencies, and C&H all worked together to get the deal done. The only reasonable conclusion from this record is that C&H wouldn't have gotten financing on do-able terms absent the federal guaranties. The Agencies therefore had sufficient control over C&H's fate to be considered a

legal cause of Plaintiffs' injuries. *Ashley v. U.S. Department of Interior*, 408 F.3d 997, 1003 (8th Cir. 2005).

The federal Agencies also argue that the Arkansas Department of Environmental Quality stands between them and Plaintiffs' injuries. It's true that C&H couldn't have opened without State approval. But that approval would have been empty had the federal Agencies not guaranteed the borrowed money C&H needed. There aren't so many other actors and events involved here that the law should draw a line and say these guaranties were not a legal cause of Plaintiffs' harm. The guaranties weren't horseshoe nails; they and their companion loans were the horses that pulled C&H into operation. *Compare Florida Audubon Society v. Betson*, 94 F.3d 658 (D.C. Cir. 1996).

- ***Redressability***

The federal Agencies argue that, in any event, a favorable ruling won't redress Plaintiffs' injuries. In one sense, this is an extension of the causation argument: the loans have already been made; Farm Credit Services of Western Arkansas and C&H, both absent third parties, now control C&H's fate. This argument, though, overlooks the federal Agencies' ongoing role in monitoring

-8-

any conditions placed on their guaranties. 15 U.S.C. § 634 & 7 C.F.R. § 1940.330.

The Agencies can still take the hard look at C&H's environmental consequences that they should have in the beginning. And if that hard look requires the Agencies to put conditions on their guaranties, then it's likely that C&H will comply with those conditions. *See Ashley, supra.* Otherwise, the farm will risk its relationship with its lender. Even though Farm Credit Services of Western Arkansas has disbursed the loan proceeds, C&H must pay the lender back. The guaranties assure that it, or the United States, will do so.

The two federal Agencies, C&H, and Farm Credit are bound together for the loans' duration. This is not a case where agencies with no oversight guaranteed loans to a host of borrowers, sometimes automatically if criteria were met. *Center for Biological Diversity v. U.S. Department of Housing and Urban Development*, 541 F. Supp. 2d 1091 (D. Az. 2008), *aff'd*, 359 Fed. App'x 781 (9th Cir. 25 November 2009). These federal agencies, through guaranty conditions, have control over C&H's case-relevant behavior. *Ashley*, 408 F.3d at 1003. More study of C&H's environmental consequences, and any resulting

conditions on reinstated guaranties, will likely redress Plaintiffs' injuries. Given the essentialness of the federal Agencies' guaranties and their continuing authority to monitor compliance with any conditions placed on those guaranties, it's likely that more environmental review will change how C&H operates its farm. Standing doctrine requires no more. *Ashley*, 408 F.3d at 1000 & 1003.

**3. National Environmental Policy Act.** The Farm Service Agency and the Small Business Administration have each interpreted the NEPA to cover its guaranty to C&H. 7 C.F.R. § 1940.312(1)(a) & 45 FED. REG. No. 232 at 79,621. But neither Agency took the required hard look into C&H's environmental impact. 42 U.S.C. § 4332; *Audubon Society of Central Arkansas v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992). While the legal analysis for each Agency is a bit different, the conclusion is the same: the federal Agencies arbitrarily and capriciously guaranteed C&H's loans. 5 U.S.C. § 706(2)(A).

- *The Farm Service Agency's Guaranty*

The Farm Service Agency arbitrarily determined that C&H would have no significant impact on the environment. The Environmental Assessment that supported the Finding of No Significant Impact was cursory and flawed.

It didn't mention the Buffalo River. It didn't mention Big Creek. It didn't mention the nearby Mt. Judea school. It didn't mention the Gray Bat. The Agency concluded that any environmental effect C&H might have would be mitigated by following the Arkansas Department for Environmental Quality's waste-disposal plan. But the Farm Service Agency failed to give reasons for that generalized conclusion. And while it certainly could've relied on the ADEQ's mitigation measures, at a minimum the Farm Service Agency had to make the case for doing so in its Environmental Assessment. *Dailey*, 977 F.2d at 435–36. It didn't. Brevity is commendable, but conclusions can't take the place of reasons. *Dailey, supra.*

The Farm Service Agency also failed to notify the public properly about its likely guaranty. The Agency's regulations mandate that, in addition to publishing notice in a State-wide newspaper, the Agency had to publish notice in a local or community paper. 7 C.F.R. § 1940.331(b)(3). The Farm Service Agency didn't do so. The size of C&H's planned swine operations made it unprecedented. That circumstance required the Agency to make its draft Finding of No Significant Impact publicly available for thirty days before adopting it. 40 C.F.R. § 1501.4(e)(2). The Agency adopted its

conclusions after making the document publicly available for half that time. The Agency's insufficient public notice didn't follow the procedure required by law. 5 U.S.C. § 706(2)(D).

- ● *The Small Business Administration's Guaranty*

As with the Farm Service Agency, the National Environmental Policy Act required the Small Business Administration to look hard at environmental issues before guaranteeing loans to a 6,500-head swine farm. The Administration didn't assess C&H's environmental effect at all. The Administration argues that it didn't have to because guaranteeing a loan doesn't implicate the NEPA's review requirements. The Administration's regulations say otherwise. When a small-business loan allocates more than "[$]300,000 for construction, reconstruction, and/or land acquisition[,]" the Administration must put the project through an environmental review. 45 FED. REG. No. 232 at 79,621. Here it guaranteed a roughly $2,300,000 loan to C&H. The Administration's lack of a hard look violated the NEPA. 5 U.S.C. § 706(2)(D).

The Administration has proposed revising the controlling regulation to move loan guaranties to individual businesses beyond the NEPA's reach.

That proposal, the Administration concedes, was never adopted. № 48 *at 23–24*. Despite any second thoughts the Small Business Administration may now have about the scope of its regulation, it controls here, and the Administration didn't follow its required procedure.

**4. Endangered Species Act.** Before guaranteeing C&H's loans, the federal Agencies had to ensure that their actions wouldn't hurt the Gray Bat. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.02. It's undisputed that this endangered species lives in caves along the Buffalo River, including at least one near C&H, and forages along the River's tributaries, including Big Creek. № 48 *at 3*. The Agencies argue that their guaranties were not actions within reach of the Endangered Species Act. This argument again understates the role of the guaranties. They were essential for C&H's financing. And C&H had to finance $3.6 million to start the farm. The federal Agencies knew that C&H would bring several thousand swine into the Buffalo River watershed. In the circumstances, the Agencies were required by law to ensure that C&H didn't jeopardize any endangered species. The Small Business Administration made no attempt to comply with the Act. The Farm Service Agency began consulting informally with the Fish and Wildlife Service, but then abandoned

any collaboration. The Endangered Species Act required more consultation by both the Small Business Administration and the Farm Service Agency. 50 C.F.R. §§ 402.13 & 402.14. And their insufficient consultation violated the law. 5 U.S.C. § 706(2)(D); *Voyageurs National Park Association v. Norton*, 381 F.3d 759, 765 (8th Cir. 2004).

### 5. The Buffalo National River Enabling Act and a Similar Regulation.

Plaintiffs claim that the federal Agencies violated this Act by guaranteeing loans to aid the construction of a water resources project. 16 U.S.C. § 460m–11. Oddly—considering the Buffalo River's prominence in this lawsuit—this claim fails.

Congress didn't define water resources project in the Act creating the Buffalo National River. The term, though, echoes words from the Wild and Scenic Rivers Act. 16 U.S.C. § 1278. The United States Department of Agriculture has interpreted the term in that Act to include construction projects in a river or along its banks, and projects that involve withdrawing something from, or discharging something into, the river. 7 C.F.R. § 1940.302(j). The sparse case law supports that reading. *Sierra Club North Star Chapter v. Pena*, 1 F. Supp. 2d 971 (D. Minn. 1998). C&H wasn't built in the

Buffalo River or along its banks. The farm doesn't withdraw anything from the River or discharge anything into it. The farm is just too far from the Buffalo to qualify as a water resources project.

Plaintiffs also claim that the Farm Service Agency violated its own regulation by not consulting with the National Park Service before giving its guaranty. The regulation Plaintiffs cite, however, applies only when the Farm Service Agency is considering a guaranty application involving a water resource project. 7 C.F.R. Pt. 1940, Subpt. G., Ex. E. This claim fails because C&H isn't that kind of project. Given C&H's location, it would, from what this Court can see, make good sense for the Farm Service Agency to consult with the Park Service. But the law makes this consultation a matter for the Farm Service Agency's informed discretion, not something for this Court to mandate.

**6. Injunction.** Injunctive relief is proper here. The Endangered Species Act provides for it. 16 U.S.C. § 1540(g). The Court has considered the relevant factors and finds that an injunction is the proper remedy for the National Environmental Policy Act violations too. *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008); *Dataphase Systems, Inc. v. C.L. Systems,*

*Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Plaintiffs have succeeded on the merits. Their interest in addressing C&H's effects on the environment will be irreparably harmed absent an injunction. On balance, the interest in getting the environmental assessment right outweighs any harm that enjoining the guaranties will cause the federal Agencies. And the public interest is best-served by ensuring that federal tax dollars aren't backing a farm that could be harming natural resources and an endangered species.

The Court appreciates the parties' helpful post-hearing briefs on the terms of the injunction. The Court's Order will follow generally the terms suggested by the Farm Service Agency and the Small Business Administration with these additions: a one-year deadline for compliance, *Save Greers Ferry Lake, Inc. v. Department of Defense*, 255 F.3d 498, 501 (8th Cir. 2001); and consultation (informal or formal, as the circumstances require) with the U.S. Fish and Wildlife Service. The Court imposes the deadline because everyone — the parties, interested non-parties such as C&H and Farm Credit Services of Western Arkansas, and the public — needs resolution sooner rather than later. In general, the Court endorses the Agencies' view that all other particulars are best returned to the Agencies' hands for more study and action

-16-

as the administrative process continues.

   **7. Loose Ends.** The parties agreed to proceed on cross motions for judgment. № 16. Plaintiffs did not press their twelfth claim about possible degradation of the water in the Buffalo. *№ 18 at ¶¶ 174–77.* That claim will therefore be dismissed without prejudice. The Court intends to enter judgment confirming its National Environmental Policy Act, Endangered Species Act, Buffalo National River Enabling Act, and regulatory rulings. That judgment will open the gate for a fee/costs motion. The Court will retain jurisdiction to address any issues that arise on remand.

* * *

   Plaintiffs' motion for judgment, № 33, granted in part and denied in part. Defendants' motion for judgment, № 37, granted in part and denied in part. The matter will be remanded to the Farm Service Agency and the Small Business Administration.

   So Ordered.

D.P. Marshall Jr.
United States District Judge

2 December 2014
